UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BRANDON BLUHM,

    Plaintiff,

v.                                      Case No. 6:19-cv-2300-WWB-LRH

WYNDHAM VACATION OWNERSHIP,
INC., WYNDHAM VACATION
RESORTS, INC., EXTRA HOLIDAYS,
LLC and FAIRSHARE VACATION
OWNERS ASSOCIATION,

    Defendants.
_____/

## **ORDER**

THIS CAUSE is before the Court on Defendants and Counter-Plaintiffs' Motion for Summary Judgement (Doc. 137), Plaintiff and Counter-Defendant's Response in Opposition (Doc. 150), and Defendants and Counter-Plaintiffs' Reply (Doc. 155). Also before the Court is Defendants and Counter-Plaintiffs' Motion for Oral Argument (Doc. 139).

**I.     BACKGROUND**

Plaintiff and Counter-Defendant, Brandon Bluhm ("**Plaintiff**"), is suing Defendants and Counter-Plaintiffs, Wyndham Vacation Ownership, Inc. ("**WVO**"), Wyndham Vacation Resorts, Inc. ("**WVR**"), Fairshare Vacation Owners Association, Inc. ("**Fairshare**"), and Extra Holidays, LLC ("**Extra Holidays**") (collectively, "**Defendants**"), for conflicts arising out of his ownership and use of numerous timeshare interests in properties developed and managed by WVO and WVR. Defendants are countersuing Plaintiff for alleged breaches of a settlement agreement between the parties and fraudulent inducement.

At his highest ownership, Plaintiff owned approximately seventy timeshare interests with Defendants worth roughly eighteen million points. (Doc. 137-89 at 76:11–15, 300:23–301:5). With the exception of two timeshares, the remaining interests were purchased from third parties. (*Id.* at 76:11–19). The majority of those interests were part of Club Wyndham Plus, which is a points-based system for making reservations at Wyndham branded and affiliate resorts. (Doc. 137-93 at 26:25–27:3, 28:18–20, 29:13–16).

Beginning sometime in 2012 or 2013, Plaintiff started renting his timeshare interests through the Extra Holidays program. (Doc. 137-89 at 87:1–10, 113:3–5). Prior to that, Plaintiff rented his interests to friends and family occasionally, but only sought to cover his expenses. (*Id.* at 83:18–84:5, 89:13–15, 114:2–6). He attempted to use eBay to rent his interests for a short amount of time, but he was not satisfied with the results. (*Id.* at 99:12–19, 115:10–116:19). After using the Extra Holidays program and finding success in covering his maintenance fees and turning a small profit, Plaintiff began purchasing additional interests in 2013. (*Id.* at 88:3–89:8). Plaintiff did so for the express purpose of making a profit on the rental of those interests and admitted that he purchased more timeshare interests than he could personally use for vacations. (*Id.* at 127:9–22; Doc. 150-1, ¶ 5). Plaintiff was able to make between six and fourteen dollars per thousand points that he placed in the Extra Holidays program and ultimately grossed "hundreds of thousands of dollars" from his rental activities. (Doc. 137-89 at 90:9–19; Doc. 150-1, ¶ 5).

In May 2017, Defendants launched a new website for reservations. (Doc. 137-90 at 39:16–20; Doc. 137-93 at 58:17–21). One of the functions of the new system was better enforcement of the rules for reservations and usage contained in the owner directory and

club guidelines. (Doc. 137-90 at 40:5–23). Although Plaintiff had experienced intermittent issues with reservations prior to that, he began having constant issues after the new website was launched. (Doc. 137-89 at 101:3–102:5). As of May 22, 2017, Plaintiff's account was locked and he did not have access to the reservation system. (*Id.* at 168:17–23, 170:1–3; Doc. 150-15 at 1; Doc. 161-1 at 2–3). Plaintiff was informed that over eight hundred owners were reporting issues with the new system. (Doc. 137-89 at 174:20–175:1; Doc. 137-108 at 2; *see also* Doc. 137-93 at 59:17–23, 61:17–62:1). Plaintiff was still able to make reservations using the house account but rarely elected to do so while he was locked out of the website. (Doc. 137-89 at 282:18–21; Doc. 137-90 at 35:10–24).

In early July 2017, Plaintiff began dealing directly with Andres Mosquera regarding the issues with his accounts. (Doc. 137-89 at 190:5–22; Doc. 150-17 at 1). Mosquera worked for the Wyndham Vacation Club, first as the director of on-site specialists and then as the director of business intelligence, process support, and operational process, excellence, and controls. (Doc. 137-90 at 11:20–23, 12:3–13:6). Mosquera became aware of Plaintiff when an employee in owner care alerted him that Plaintiff was interested in selling back some of his interests. (*Id.* at 20:16–21:3). While he was working with Plaintiff, Mosquera assisted Plaintiff in placing reservations into the Extra Holidays program for rent. (Doc. 137-89 at 191:17–192:23, 203:20–204:3). Plaintiff and Mosquera also discussed downsizing Plaintiff's account, including deeding a number of properties back to Defendants, which Plaintiff had previously discussed with other representatives in connection with payment issues. (*Id.* at 194:2–23, 195:10–196:4; Doc. 150-16 at 1–2). Plaintiff states that Mosquera told him that his account would not work because he had too many points and transactions associated with the account and that he would not be

3

able to access the system unless he divested himself of a majority of his points. (Doc. 150-1, ¶¶ 11–13).

On August 31, 2017, as a result of his discussions with Mosquera, the parties entered into a Confidential Agreement and Release ("**Settlement Agreement**," Doc. 137-84). Therein, Defendants agreed to purchase a number of Plaintiff's timeshare interests, and in exchange, Plaintiff agreed "not to engage in any commercial conduct of any type as part of their use of the Retained Interests," including commercial rental of his remaining interests through any entity related to Defendants; not to acquire, directly or indirectly, new interests in Defendants' products from Defendants or third-parties; and not to "assist, advise, counsel or otherwise direct any other owner or person in control of any Timeshare Interest . . . in renting, selling, or otherwise disposing of such interests[.]" (*Id.* at 2–3). Additionally, Plaintiff agreed that with respect to his remaining timeshare interests, he would "abide by the Rules and Regulations of all Programs, including, but not limited to, published policies and procedures and website terms and conditions[.]" (*Id.* at 4). Plaintiff also agreed to "RELEASE, ACQUIT, DISCHARGE, AND . . . HOLD HARMLESS" Defendants "of and from any and all claims, demands, and causes of action owned or held by [Plaintiff] . . . , which arise from and/or result from or in any way relate to Timeshare Interests, including but not limited to any claims based on any alleged representation or promise made to [Plaintiff] by any current or former employee or agent of [Defendants], and any and all claims to date, whether or not those claims were specifically included in this Agreement." (*Id.* at 4–5).

In connection with the buy back, Mosquera told Plaintiff how many points he could keep in this account—roughly five million—and, based on that number, Plaintiff gave

Mosquera a list of the properties that he wanted to deed back.[1] (Doc. 137-89 at 198:3–199:8). The number set by Mosquera was intended to reflect the total points that Plaintiff would be able to use for personal use, which Plaintiff understood. (*Id.* at 199:18–200:2, 201:16–22, 202:2–6). Mosquera testified that he had discussed Plaintiff using no more than fifty percent of his points for rentals through the Extra Holidays program, although that specific provision was not included in the Settlement Agreement. (Doc. 137-90 at 67:3–4, 71:6–11, 77:18–20, 113:2–4; Doc. 150-28 at 2; Doc. 150-29 at 1). However, Plaintiff states that he was told that he would be permitted to continue to use the Extra Holidays program even after entering the Settlement Agreement. (Doc. 150-1, ¶ 13). Plaintiff's account was locked during his dealings with Mosquera so that Defendants could reconcile his account and confirm that he had the correct number of points pursuant to the terms of their agreement. (Doc. 137-90 at 26:2–20).

After signing the Settlement Agreement, Plaintiff sought clarification from Mosquera regarding statements he made prior to the execution of the Settlement Agreement. (Doc. 137-89 at 215:5–10). Mosquera responded that Plaintiff was not permitted to use his retained interests for commercial purposes, including renting them through the Extra Holidays program, with the exception of leftover points that Plaintiff did not personally use throughout the year, and that Plaintiff could not acquire new interests without first getting permission to waive the restriction from Defendants. (*Id.* at 215:11–216:5). Plaintiff states that this is not an accurate reflection of Mosquera's statements prior to his execution of the Settlement Agreement. (*Id.* at 216:6–8). Specifically, Plaintiff

---

[1] Mosquera testified that Plaintiff set the number of points that he wished to keep and that Mosquera never told him that he was required to sell any points or interests to regain access to the reservations system. (Doc. 137-90 at 36:9–13, 42:3–8, 50:8–15).

claims that Mosquera told him that he would still be permitted to use the Extra Holidays program, just not at the same level as he was before entering the Settlement Agreement. (*Id.* at 217:23–218:2, 224:11–19). In fact, Plaintiff was aware that after signing the Settlement Agreement, his use of Extra Holidays was limited, at the very least, to offsetting his maintenance fees. (*Id.* at 244:1–9).

In 2018, Mosquera e-mailed Plaintiff to inform him that Defendants were aware of violations of the Settlement Agreement, including that Plaintiff had acquired new interests and that fifty percent of his 2018 reservations were rented through the Extra Holidays program, which Plaintiff admitted was probably true. (*Id.* at 234:11–21, 236:13–237:3; Doc. 137-103 at 2). Plaintiff admits that he continued to rent his interests after signing the Settlement Agreement. (Doc. 137-89 at 212:5–7, 219:8–10, 227:22–228:9). He also acquired two new interests and attempted to acquire a third, which Defendants denied. (*Id.* at 314:23–315:10).

## II.   LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing

"that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

### III.   DISCUSSION

As an initial matter, Defendants have requested oral argument to allow them to make additional or more detailed arguments in favor of their Motion for Summary Judgment. Having reviewed the parties' filings and the evidence, this Court finds that oral argument would not assist the Court in resolving the Motion for Summary Judgement, and therefore, the request will be denied.

The Third Amended Complaint (Doc. 77) alleges fourteen claims against the various Defendants for violations of the Florida Deceptive and Unfair Trade Practices Act ("**FDUTPA**"), Fla. Stat. § 501.201 *et seq.*; breach of fiduciary duty; violation of the Arkansas Trust Code; negligence; fraudulent concealment; fraud; fraud in the inducement; and declaratory relief. Defendants filed counterclaims against Plaintiff for breach of contract and fraudulent inducement arising out of the Settlement Agreement.

(Doc. 97 at 108–19). Defendants now seek summary judgment as to each claim asserted by Plaintiff and liability as to their counterclaims.

### A. Plaintiff's Claims

Defendants argue that Plaintiff waived each of his claims pursuant to the Settlement Agreement's "Release and Discharge by Owners" provision. (Doc. 137-84 at 4–5). In his Response, Plaintiff argues various defenses to the enforceability of the general release, including a lack of a meeting of the minds regarding his continued use of the Extra Holidays program, fraudulent inducement, duress, material breach by Defendants, unreasonable restraint, and unconscionability.

The existence of a release is an affirmative defense. *Moss v. Am. Priv. Equity, LLC*, No. 19-14777, 2021 WL 4848138, at *1 (11th Cir. Oct. 18, 2021); *Rakip v. Paradise Awnings Corp.*, 514 F. App'x 917, 920 (11th Cir. 2013). At the summary judgment stage, the "defendant has the initial burden of making a showing that the [affirmative] defense is applicable." *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990). "Once a defendant shows that the applicable [affirmative defense] bars the claim, the burden shifts to the plaintiff to demonstrate that an exception . . . applies." *Id.* at 1552 n.13; *see also Off. of Thrift Supervision v. Paul*, 985 F. Supp. 1465, 1470 (S.D. Fla. 1997).

Defendants have met their burden. As an initial matter, Plaintiff has not argued or disputed that if the release is valid, it bars each of his claims in this lawsuit. Moreover, the language of the release broadly excludes "any and all claims, demands, and causes of action . . . , which arise from and/or result from or in any way relate to Timeshare Interests, including but not limited to any claims based on any alleged representation or promise made to Owners by any current or former employee or agent of [Defendants]" as of the

date of the Settlement Agreement. (Doc. 137-84 at 5). Each claim set forth in the Third Amended Complaint arises from or relates to Plaintiff's ownership of timeshare interests or statements purportedly made by Defendants' representatives at or before the time he entered the Settlement Agreement or to the interpretation of the terms of the Settlement Agreement. (*See* Doc. 77, ¶¶ 172, 179, 185, 192, 198–99, 201, 208–09, 224, 233, 241, 246, 252, 259–61, 276, 290–91). Furthermore, the release includes claims against WVO and "the Trusts, the Trustees, the Programs, and each of their agents, servants, affiliates, subsidiaries, parent entities, representatives, employees, directors, board members, shareholders, members, beneficiaries, officers, attorneys, and insurers, and all persons, firms, organizations or corporations in privity with the foregoing (even if such persons or entities are not specifically named in this Agreement), and the predecessors, successors and assigns of each of them[.]" (Doc. 137-84 at 4–5). Plaintiff does not dispute that this includes each of the named Defendants in this lawsuit. (*See* Doc. 77, ¶¶ 7–9, 12, 16). Thus, this Court is satisfied that the release bars Plaintiff's claims in this lawsuit unless Plaintiff can come forward with a defense to its enforcement.

Plaintiff has not met his burden in showing that any genuine dispute of material fact precludes summary judgment as to Defendants' affirmative defense. To the extent that Plaintiff argues that "the Settlement Agreement is unenforceable on the grounds of waiver, Wyndham's material breach, . . . unreasonable restraint, and unconscionability[,]" Plaintiff has failed to further elaborate on these arguments or to direct the Court to any record evidence or legal authority in support of such arguments. (Doc. 150 at 14). Accordingly, the Court deems these arguments waived. *W. Sur. Co. v. Steuerwald*, No. 16-61815-CV, 2017 WL 5248499, at *2 (S.D. Fla. Jan. 17, 2017) ("It is axiomatic that

9

arguments not supported and properly developed are deemed waived."); *see also Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

Turning to Plaintiff's remaining arguments, Plaintiff claims that no contract was formed because there was no meeting of the minds regarding the extent of his continued use of the Extra Holidays program. Although this argument is also woefully underdeveloped, the Court has considered its merits and is not persuaded. First, Plaintiff has not shown any evidence that there is an objective question as to the parties' agreement regarding his commercial activities. "A meeting of the minds is determined by an objective test; it is not what the parties meant but what they said that is determinative." *Villareal v. Eres*, 128 So. 3d 93, 100 n.5 (Fla. 2d DCA 2013). As relevant, the Settlement Agreement states that "Owners agree not to engage in any commercial conduct of any type as part of their use of the Retained Interests, which would include the use of Extra Holidays[.]" (Doc. 137-84 at 2). Contrary to Plaintiff's arguments, this language is not ambiguous and is susceptible to only one objectively reasonable interpretation. *See Nature's Prods., Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1318–19 (S.D. Fla. 2013); *see also Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014) ("Traditional contract-interpretation principles make contract interpretation a question of law, decided by reading the words of a contract in the context of the entire contract and construing the contract to effectuate the parties' intent."). It is clear that the objective intent of the parties was that Plaintiff would cease using the Extra Holidays program for commercial gain. In other words, Plaintiff would no longer use the program to seek a profit from his timeshare ownership. Plaintiff's *post hoc* attempts to argue that the term commercial is ambiguous are without merit. While the word commercial can be used to refer to an advertisement,

to read such a meaning into this provision would lead to an absurd result. *AECOM Tech. Servs., Inc. v. Pro. Servs. Indus., Inc.*, No. 8:18-cv-2981, 2021 WL 6197782, at *4 (M.D. Fla. Dec. 29, 2021) ("A contract is ambiguous when there are competing reasonable interpretations of the instrument, but 'fanciful, inconsistent, and absurd interpretations' do no not create ambiguity." (quoting *Nabbie v. Orlando Outlet Owner, LLC*, 237 So. 3d 463, 467 (Fla. 5th DCA 2018))). Furthermore, Plaintiff testified that he understood that he was agreeing to a restriction on his use of the Extra Holidays program. (Doc. 137-89 at 216:6–8, 217:23–218:2, 224:11–19, 244:1–9). Thus, Plaintiff has not shown that there was no objective meeting of the minds regarding his continued commercial use of the Extra Holidays program. *See Martin Energy Servs., LLC v. M/V Bravante IX*, 233 F. Supp. 3d 1269, 1274–75 (N.D. Fla. 2017) (holding that a contract passed the objective test for the meeting of the minds where the negotiations resulted in a written agreement "that could bear only one meaning").

Second, while the Settlement Agreement does not specifically state what amount of activity would cross the threshold from personal use to commercial use, Plaintiff has not shown that such a term was essential to a meeting of the minds. *ABC Liquors, Inc. v. Centimark Corp.*, 967 So. 2d 1053, 1056 (Fla. 5th DCA 2007) ("However, what constitutes an essential term of a contract will vary widely according to the nature and complexity of each transaction and must be evaluated on a case specific basis."). Based on the parties' agreement, it does not appear that a specifically enumerated amount of rental activity was an essential term. Instead, the essential term was that Plaintiff would cease actively attempting to turn a profit, which, as set forth above, is fully and clearly delineated in the Settlement Agreement. Therefore, the Court is satisfied that a valid agreement was

formed containing the essential terms to which the parties objectively agreed; Plaintiff's argument to the contrary is without merit.

Next, Plaintiff argues that he was fraudulently induced into entering the Settlement Agreement because Mosquera told him that Defendants could not grant Plaintiff access to the new reservation system unless he did so even though it was physically possible for Defendants to do so. Plaintiff's argument, again, misses the mark. "To prove fraudulent inducement, a plaintiff must show that (1) a false statement was made regarding a material fact; (2) the person making the statement knew or should have known it was false; (3) the maker intended that the other party rely on the false statement; and (4) the other party justifiably relied on the statement to its detriment." *R-Stream, LLC v. Wingstop Rests., Inc.*, No. 8:08-cv-2221-T-33EAJ, 2009 WL 3294812, at *5 (M.D. Fla. Oct. 13, 2009) (quotation omitted).

The crux of Plaintiff's argument is that Mosquera falsely told him that Defendants could not permit him to access the system unless he agreed to enter the Settlement Agreement. Plaintiff has not, however, directed this Court to any record evidence that Mosquera's statement was untrue or that, even if Mosquera's omission could be construed as a false statement, it was material. Simply because Defendants had the physical capability of allowing Plaintiff to access his account, he has not shown that they were obligated to or would have done so absent his assent to the Settlement Agreement. Thus, there is no evidence that Mosquera's statement was false because it appears that, under its own policies, Defendants could not permit Plaintiff to regain access to his account. In the alternative, that they could physically permit him access is immaterial if

12

Defendants had no obligation or intention of doing so. Thus, Plaintiff's fraudulent inducement defense also fails.

Lastly, Plaintiff's perfunctory argument regarding duress fails to show any issue of material fact. "Duress requires improper external pressure or influence that practically destroys the free agency of a party and causes him to do an act or make a contract not of his own volition." *Cableview Commc'ns of Jacksonville, Inc. v. Time Warner Cable Se., LLC*, 901 F.3d 1294, 1304 (11th Cir. 2018) (quotation omitted). "[T]he pressure of financial circumstances standing alone is insufficient to establish duress. A party seeking to void a contract for duress must establish that it had no alternative as a result of the improper or wrongful conduct of another." *Id.* at 1304 n.7 (quotations omitted). Therfore, to establish economic duress under Florida law, "[t]he aggrieved party must show: (1) wrongful acts or threats, (2) financial distress caused by the wrongful acts or threats, and (3) absence of a reasonable alternative course of action." *Leader Glob. Sols., LLC v. Tradeco Infraestructura, S.A. DE C.V.*, 155 F. Supp. 3d 1310, 1318 (S.D. Fla. 2016) (citation omitted). Even assuming that Plaintiff had argued or shown evidence of the first two elements, which he did not, he has admitted that there is no evidence that the third prong is satisfied. Specifically, Plaintiff has admitted that he was still able to make reservations during the relevant period and place them in the Extra Holidays program, albeit with the assistance of Defendants' employees instead of directly through the website. (Doc. 137-89 at 191:17–192:23, 203:20–204:3, 282:18–21; Doc. 137-90 at 35:10–24). Thus, there is no record evidence that Plaintiff lacked a reasonable alternative to signing the Settlement Agreement. As such, Plaintiff's duress argument fails. Because Plaintiff has not met his burden in showing that there is a material issue of fact regarding any valid

defense to the enforcement of the Settlement Agreement's release, Defendants' Motion for Summary Judgment will be granted as to the claims set forth in the Third Amended Complaint.

### B. Defendants' Counterclaims

Defendants also seek summary judgment regarding their counterclaims against Plaintiff for fraudulent inducement and breach of contract. First, Defendants make the conclusory argument that Plaintiff fraudulently induced them into entering the Settlement Agreement by falsely stating that he would abide by the terms thereof. "To prove fraudulent inducement, a plaintiff must show that (1) a false statement was made regarding a material fact; (2) the person making the statement knew or should have known it was false; (3) the maker intended that the other party rely on the false statement; and (4) the other party justifiably relied on the statement to its detriment." *R-Stream, LLC*, 2009 WL 3294812, at *5 (quotation omitted). However, Plaintiff explicitly stated in his deposition that his conduct "changed immediately after" entering the Settlement Agreement, (Doc. 137-89 at 267:18–268:6), testimony that Defendants conveniently fail to cite. This is sufficient evidence, standing alone, to create a genuine issue of material fact regarding both the falsity of Plaintiff's promises and his intent in making representations to Defendants. Therefore, Defendants' Motion will be denied with respect to fraudulent inducement.

Second, Defendants argue that Plaintiff breached the Settlement Agreement by filing this lawsuit, disclosing the terms of the Settlement Agreement in his pleadings, acquiring additional timeshare interests, and engaging in commercial rental activity. "To sustain an action for breach of contract under Florida law, a plaintiff must establish the

14

following elements: (1) a valid contract, (2) a material breach, and (3) damages." *De Gazelle Grp., Inc. v. Tamaz Trading Establishment*, 113 F. Supp. 3d 1221, 1223 (M.D. Fla. 2014) (quotation omitted). Here, it appears that Defendants have shown sufficient evidence of one or more breaches of the Settlement Agreement, which Plaintiff has proffered little record evidence to rebut. Nevertheless, the Court finds that neither party has provided adequate briefing on this claim to permit the Court to make a reasoned determination regarding Plaintiff's liability for breach of contract or the validity and applicability of the liquidated damages clause. Therefore, the Court will reserve its ruling as to Defendants' claim for breach of contract against Plaintiff and will direct the parties to submit supplemental briefing on this issue.

## IV. CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants and Counter-Plaintiffs' Motion for Summary Judgement (Doc. 137) is **GRANTED in part** and **DENIED in part** as set forth herein. To the extent that Defendants request summary judgment as to Count I of the Countercomplaint, the Court reserves judgment pending additional briefing.

2. On or before **January 21, 2022**, Defendants shall file a supplement brief, not to exceed fifteen pages, limited solely to Count I of the Countercomplaint to address the issues noted in this Order. No later than **fourteen days** after Defendants file their supplemental brief, Plaintiff shall file a response, not to exceed ten pages, thereto.

3. Defendants and Counter-Plaintiffs' Motion for Oral Argument (Doc. 139) is **DENIED**.

15

**DONE AND ORDERED** in Orlando, Florida on January 6, 2022.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record